## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **ABEL TORRES,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 06-3237-KHV** |
| **RAY ROBERTS, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER

Pursuant to 28 U.S.C. § 2254, *pro se* petitioner Abel Torres seeks a writ of habeas corpus based on insufficient evidence, violation of his right to confront witnesses and his right to due process, erroneous jury instructions, violation of his right not to incriminate himself, erroneous admission of evidence including expert testimony, prosecutorial misconduct and cumulative error. See Petition (Doc. #1) filed August 25, 2006. For reasons stated below, the Court denies the petition.

### Procedural Background

On October 18, 2001, the State of Kansas charged Torres with one count of felony murder in violation of K.S.A. § 21-3401(b). Kansas v. Torres, Case No. 01 CR-39, District Court of Wichita County, Kansas. On August 16, 2002, a jury found Torres guilty of one count of felony murder in the first degree based on the underlying crime of felony abuse of a child. On March 12, 2003, the district court denied Torres' motions for a new trial and a judgment of acquittal. The court then sentenced Torres to life in prison with no possibility of parole for 20 years.

Pursuant to K.S.A. § 22-3601, Torres appealed his conviction to the Kansas Supreme Court.[1]

---

[1]    Kansas law provides that an appeal in a criminal case in which a life sentence has been imposed shall be taken directly to the Kansas Supreme Court. See K.S.A. § 22-3601.

On appeal, Torres argued that (1) the record contained insufficient evidence of felony murder; (2) the trial court violated his Sixth Amendment right to confront witnesses when it admitted his statements to law enforcement officials; (3) the state violated his due process rights because it did not record his two interviews with law enforcement officers and the trial court erred when it did not instruct jury that it could make an inference against the state based on failure to record the interviews; (4) the trial court violated his rights under Miranda v. Arizona, 384 U.S. 436 (1966), by admitting evidence of his statements to law enforcement officials; (5) the trial court erred in not instructing the jury on the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter; (6) the trial court erred in admitting autopsy photographs; (7) the trial court erred in denying a motion for mistrial based on allegations that the prosecutor tampered with a witness; (8) the trial court erred in allowing demonstrative illustrations of "shaken impact" and "shaken baby" syndrome; (9) the trial court erred in allowing the state to call six expert witnesses; (10) the trial court erred in allowing certain expert testimony of Dr. Mary Dudley; and (11) the cumulative effect of trial errors deprived him of his right to a fair trial.  See State v. Torres, 280 Kan. 309, 310-11, 121 P.3d 429, 433 (2005).  The Kansas Supreme Court affirmed Torres' conviction. On August 25, 2006, Torres filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting the arguments raised on direct appeal.

### Evidence At Trial

In a federal habeas proceeding, the state court's factual findings are presumed correct and petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Torres has not submitted any statement of facts and does not appear to dispute the factual summary in the Kansas Supreme Court opinion.  Accordingly, the Court incorporates that

version of the facts, as follows:

Tianna Rodriguez was almost 21 months old at the time of her death on June 27, 2001.  She lived with her mother, Susan Rodriguez, and her father, Abel Torres, in Leoti, Kansas.

Tianna had been sick with a fever and vomiting on Sunday, June 24, but her condition appeared to improve the next day.  On Monday, June 25, Tianna and her parents visited her grandparents and returned home.  Later that day, Torres drove Susan to work and Tianna rode with them.  That evening, Torres called his mother, Teresa Torres, and told her that Tianna was playing with her dolls in the front room and waiting for supper.  A few seconds later, Torres called Teresa again and said, "[M]other, come quick, she fell and she's unconscious."  Teresa drove to the house, where she found Tianna unresponsive.  Teresa carried Tianna to the bathroom and put water on her face, but Tianna did not respond.  Teresa called an ambulance.  When emergency personnel arrived, Tianna was still unresponsive and she was transported by ambulance to the Wichita County Hospital in Leoti.

Meanwhile, Susan received a phone call at work to go to the emergency room because something was wrong with Tianna.  Susan arrived at the hospital about the same time as Tianna.  While medical personnel attended to Tianna, Susan asked Torres what had happened.  Torres said that Tianna had fallen off a chair.

At the hospital, Dr. David Thetford observed that Tianna was having seizures every few minutes.  She also had a slight temperature and an elevated white blood cell count.  Dr. Thetford transferred Tianna to St. Catherine's Hospital in Garden City, Kansas ("St. Catherine's") for pediatric evaluation and further treatment.  Dr. Thetford did not believe that Tianna's condition was consistent with the report that she had fallen off a chair.

3

Tianna arrived at St. Catherine's at 9:00 p.m. on June 25.  She remained totally unresponsive and her eyes were dilated, but she was breathing fine and had no more seizures.  Dr. Soen B. Liong, a radiologist, evaluated CAT scans taken at St. Catherine's.  The CAT scans of Tianna's brain and spine showed swelling, fresh blood up to two days old, and a small amount of old blood up to a week old.  Dr. Liong diagnosed an intentional injury, i.e. shaken baby syndrome.

Dr. James Zauche, a pediatrician, treated Tianna at St. Catherine's.  According to Dr. Zauche, Tianna's neurological and eye exams were abnormal.  Tianna also exhibited abnormal movements consistent with brain injury.  Dr. Zauche first diagnosed a brain hemorrhage.  Based on Dr. Liong's findings, Dr. Zauche further diagnosed the injuries as consistent with shaken baby syndrome.  Dr. Zauche did not believe that the injuries were consistent with falling off a chair.

A few hours after Tianna arrived at St. Catherine's, Dr. Zauche transferred her by air ambulance to the intensive care unit at Wesley Medical Center ("Wesley") in Wichita, Kansas.  At Wesley, Dr. Lindall Smith examined Tianna at around 2:00 a.m. on Tuesday, June 26.  A CAT scan taken at Wesley revealed that Tianna's brain swelling had increased significantly in three hours.  According to Dr. Smith, Tianna responded only to painful stimuli, and her response was to "posture," that is, to stiffen her arms or legs.  Posturing is a very minimal response that Dr. Smith sometimes sees with severe head injuries.  Tianna also had bilateral retinal hemorrhages and high levels of intracranial pressure.

Tianna's parents gave Wesley personnel the following medical history: On June 24, Tianna had a fever, was vomiting and was not her usual active self.  By the next day, however, she was back to normal.  Tianna and Torres had supper and were sitting in a rocking chair together.  Torres left the room while Tianna remained in the chair.  Torres heard Tianna fall and returned to the room.  He

found Tianna face down on the floor and fairly unresponsive.

According to Tianna's parents, Tianna had also fallen out of a grocery cart onto a concrete floor in May or April of 2001 but did not lose consciousness.  They also suspected that several weeks before the fall on June 25, Tianna had fallen off her bed while jumping on it.  After that incident they had taken Tianna to the Wichita County Hospital emergency room.  At that time medical personnel did not identify any significant neurological impairment.

On Tuesday, June 26, the day Tianna went to Wesley, Susan again asked Torres what had happened to Tianna.  Torres said that Tianna had fallen off the chair.  Susan told Torres that she knew he had shaken Tianna.  He admitted shaking Tianna but claimed that he had not done it on purpose.  Early on Wednesday, June 27, however, Torres told Susan that Tianna had simply fallen and that he had not done anything.

Karen King, a social worker at Wesley, spoke with Susan several times throughout the day on June 27.  King was present while Susan phoned Torres from King's office.  According to King, Susan asked Torres, "Did you shake her?"  Susan then said, "Why didn't you tell me?  We could have gotten her help sooner."  Susan was upset and was crying and told Torres, "I don't hate you. I will always love you."  King believed that Torres was admitting that he had shaken the child.  After Susan finished the call, she told King that Torres said he had shaken Tianna three times.

On June 27, doctors reviewed a series of tests and determined that Tianna was brain dead. At 12:55 p.m. they removed her from life support.

Agent Kelly Robbins of the Kansas Bureau of Investigation ("KBI") and Wichita County Sheriff Wayne Collins interviewed Torres from 8:30 to 10:30 a.m. on June 27 at the sheriff's department.  Robbins testified as follows:

5

> He [Torres] said that they had slept late on Sunday [June 24], gotten up around 10 to
> 11 a.m. and they had breakfast. Around 1:30 p.m. Tianna was fussy and he took her
> into his and Susan's bedroom. While in the bedroom Tianna was hitting and kicking
> and biting him, trying to get away from him. He - to try and keep her from doing this
> and to calm her down, he said that he would grab her by her hands and pull her real
> hard towards him. Then he would put his arms around her, trying to keep her from
> the kicking and hitting until she calmed down. He said then he would - once she
> calmed down, he would sit her next to him or lay her down next to him and he would
> try to be real nice to her like trying to get her to give him a hug or give her babies a
> hug. Then all of a sudden she would snap again, start the crying and fighting him,
> trying to get away from him, so he would grab her hands again, pull her real hard
> towards him. And then he would put his arms around her and try to control her again.
> He said that happened about three times during that period. . . . He said that he pulled
> her hard enough by her hands that her head would bounce and that he felt that it could
> have hurt her, it was that hard. Also, when he was putting his arms around her to try
> and control her, he said that he squeezed her hard enough that he felt that it could
> have broken her rib.

According to Robbins, Torres said that the last time he pulled and squeezed Tianna, she became

hysterical and vomited shortly afterward. She continued to vomit. Torres and Susan gave her a cool

bath to cool her off. During that time she acted really tired, her eyes would roll back in her head, and

she was having a hard time staying awake. They called the hospital, received instructions on what

to do, picked up medicine and papers from the hospital, and watched her throughout the evening.

Tianna continued to vomit until midnight, when she was able to keep down some food and liquid.

Torres told Robbins that on Monday, June 25, they had gotten up late and had breakfast.

Tianna was still very weak and stumbling some when they went to his parents, but she was better

than the day before. Susan went to work around 4:00 p.m., and Torres stayed home to watch Tianna.

According to Robbins:

> He [Torres] said he fed her spaghetti and meatballs that evening, and after she had
> eaten, he put her in the green swivel chair with her dolls or her babies, and then he
> had walked out of the room, and that's when he heard Tianna fall. When he came into
> the room, she was lying face down on the floor in front of the green swivel chair
> holding her head with her hands. . . . He said that he went over to her. She was not
> breathing real well. He gave her a few breaths with CPR. He had - and then she went

unconscious. He panicked and called his mother.

Robbins testified that Torres said he did not intend to harm his daughter and that he forgot how fragile she was and how much bigger he was than she was. He said that he was just trying to make Tianna like him and that he just got too rough with her. After the interview Torres left the sheriff's department with his mother.

On July 6, 2001, Robbins and Collins again interviewed Torres at the sheriff's department. They had asked Torres to come in because they had additional information from the autopsy. Robbins testified about what Torres told them that day:

> He said that after Susan - they dropped Susan off for work [on June 25], him and Tianna drove around listening to music for about 15 minutes. When they got home, he did feed her spaghetti and meatballs. She was sitting on his lap. They were sitting on the green swivel chair, fed her a little bit, and she got sick and vomited all over him, and this made him very upset and mad.

> He said that he did not want to hurt Tianna by spanking her for what she did, so instead, he took her into his and Susan's bedroom and stood at the foot of the bed and threw Tianna very hard to the top of the bed. He was aiming for the pillows, but he missed the pillows, and the right side of her head hit the end table that's on the west side of the bed.

> He said that when she hit that end table, she screamed and held her head. He knew that from the scream he had hurt her pretty bad. He went over and picked her up and she was unconscious in his arms. He took her shirt off, was going to try and give her a cool bath again to try and revive her, and he realized she was in pretty bad shape.

> He panicked and said - called his mother who came over. She, again, did try to wipe her down and realized that that was not going to work and his mother called the hospital for an ambulance.

At the end of the interview, Robbins asked Torres if he wanted Robbins to tell his mother and father what had happened, or if Torres wanted to tell them. Torres told Robbins that he wanted to talk to

7

his mother first and then he was going home to tell Susan what happened.[2] He then left the sheriff's department.

Later that day, July 6, Torres spoke with Susan outside their home.  According to Susan, Torres told her that he was feeding Tianna and that she had thrown up on him.  He said that he had taken Tianna to the bedroom, shaken her and tossed her onto the bed, but that she had bounced and her head hit a night stand.  Susan's impression was that Torres had shaken Tianna violently.

On July 9, law enforcement officers arrested Torres for Tianna's death.

At trial, several medical experts testified in detail about their medical opinions on what caused Tianna's injuries and resulting death.  Highly summarized, the experts testified that Tianna suffered severe brain injury, retinal hemorrhages, a linear skull fracture, swelling and flattening of the brain, fractures of her first, second and eleventh ribs, injuries to her hands and feet, and various bruises.  Dr. Smith of Wesley Medical Center testified that a child of Tianna's age and size could not sustain such injuries from falling off a chair.  He testified that the injuries could be consistent with someone violently shaking her, throwing her approximately seven feet, and hitting her head on the side of an end table.

Dr. Debra Desilet-Dobbs, a pediatric radiologist, testified that the subdural hematoma and brain injury indicated very significant intense trauma.  She testified that these injuries are seen in high-speed head-on vehicle collisions and, in non-accidental cases, with violent shaken impact.  She testified that both injuries were caused by the same event.  Dr. Desilet-Dobbs found that it was highly unlikely the injury occurred before Sunday, June 24.

---

[2]       Torres spoke to his mother alone in the interview room but told Robbins that he did not want to talk with his father.

8

Dr. Mary Dudley is an expert in shaken baby syndrome and shaken impact syndrome and performed an autopsy on Tianna on June 28, 2001.  She diagnosed shaken impact syndrome as the cause of Tianna's death.  According to Dr. Dudley, Tianna's injuries were not consistent with falling from a chair or out of a grocery cart; Tianna's injuries were consistent with shaking, being thrown the length of a bed and striking her head on a night stand.

Dr. Katherine Melhorn, a pediatrician and faculty member at the University of Kansas School of Medicine in Wichita, consulted with the Wesley care team about Tianna's care.  Dr. Melhorn observed bruises on the left side of her chest and retinal hemorrhages in both eyes but not a lot of obvious external injuries.

Dr. Richard Gilmartin, a child neurologist, testified for the defense as an expert witness on head injuries resulting from child abuse.  Dr. Gilmartin testified that there was no evidence that Tianna was shaken.  In his opinion, Tianna died of trauma, and brain swelling.  He testified that brain swelling that began on Monday, June 25, could not cause the brain sutures to stretch apart so quickly.  Dr. Gilmartin testified that Tianna died as a result of severe child abuse, but he did not believe that throwing a child six or seven feet into a night stand would inflict an injury sufficient to cause death.

Torres called several other witnesses to testify about Tianna's activities and injuries before her death.

The jury convicted Torres of first-degree felony murder based on the underlying crime of felony abuse of a child.  As noted, the trial court sentenced him to life in prison with no eligibility of parole for 20 years.

### Standards For Habeas Petitions Under 28 U.S.C. 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in relevant part at

9

28 U.S.C. § 2254, governs the Court's review.  Under Section 2254, as amended by AEDPA, the

Court may not issue a writ of habeas corpus with respect to any claim which the state court

adjudicated on the merits unless that adjudication resulted in a decision:

> (1) . . . that was contrary to, or involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme Court of the United States;
> or
>
> (2) . . . that was based on an unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. 2254(d)(1)-(2).  Under the "contrary to" clause, the Court may issue a writ of habeas

corpus only if (1) the state court arrived at a conclusion opposite to that reached by the United States

Supreme Court on a question of law, or (2) the state court decided the case differently than the

Supreme Court on a set of materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 405-

06 (2000).  Under the "unreasonable application" clause, the Court may grant habeas relief if the

state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a

prisoner's case."  Id. at 407-08.  The Court may not issue a writ simply because it concludes, in its

independent judgment, that the state court applied clearly established federal law erroneously or

incorrectly; the application must be objectively unreasonable.  Id. at 409-11.

### Analysis

Torres' habeas corpus petition lists eleven grounds for relief: (1) the record contained

insufficient evidence of felony murder; (2) the trial court violated his Sixth Amendment right to

confront witnesses when it admitted evidence of his statements to law enforcement officials; (3) the

state violated his due process rights because it did not record his two interview with law enforcement

officers, and the trial court erred when it did not instruct jury that it could make an inference against

the state based on the failure to record the interviews; (4) the trial court violated his Miranda rights

10

by admitting evidence of his statements to law enforcement officials; (5) the trial court erred in not instructing the jury on the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter; (6) the trial court erred in admitting numerous autopsy photographs; (7) the trial court erred in denying a motion for mistrial based on allegations that the prosecutor tampered with a witness; (8) the trial court erred in allowing demonstrative illustrations of "shaken impact" and "shaken baby" syndrome; (9) the trial court erred in allowing the state to call six expert witnesses; (10) the trial court erred in allowing certain testimony of expert witness Dr. Mary Dudley; and (11) the cumulative effect of trial errors deprived him of his right to a fair trial.  Respondents deny Torres' claims.

## I.    Procedural Default

Respondents argue that Torres did not raise three of his claims before the state courts: (1) that the trial court violated his Sixth Amendment right to confrontation when it admitted evidence of his confession; (2) that the trial court violated his Sixth Amendment rights when it admitted gruesome photographs into evidence; and (3) that the trial court erred in allowing the state to introduce testimony of six experts on shaken baby syndrome.  Respondents argue that Torres has procedurally defaulted such claims.

Regarding Torres' confrontation rights, the Kansas Supreme Court noted that Torres had not preserved the issue for appeal but it proceeded to rule on the merits of the issue.  See Torres, 280 Kan. at 319, 121 P.3d at 438 (citing preservation rule, but stating that "[b]ecause this argument appears to be recurring . . . we will address it now").  Torres has thus exhausted this issue and the Court considers it on the merits, below.

As to the other two claims, Torres raised both issues on appeal.  The Kansas Supreme Court

declined to consider the two issues, however, because petitioner had not preserved the issues at trial. In so ruling, the Kansas Supreme Court relied upon the state procedural rule that issues not presented to the trial court will ordinarily not be considered on appeal. Torres, 280 Kan. at 327-28, 333,121 P.3d at 442-43, 446 (citing K.S.A. § 60-404; State v. Diggs, 272 Kan. 349, 365, 34 P.3d 63 (2001)).

If a state court denies a federal claim on the basis of a separate state procedural deficiency, this Court cannot reach the merits of the claim unless (1) the state ground of decision was not adequate and independent of federal law; or (2) petitioner has established a basis for excusing his procedural default. McCracken v. Gibson, 268 F.3d 970, 976 (10th Cir. 2001) (on habeas review, federal court will not consider issues that have been defaulted in state court on independent and adequate state procedural ground unless petitioner can demonstrate cause and prejudice or fundamental miscarriage of justice). A state procedural ground is independent if it relies on state law, rather than federal law, as the basis for decision. Id. To be adequate, a state procedural rule must have been firmly established and regularly followed when the purported default occurred. Id. (citing Clayton v. Gibson, 199 F.3d 1162, 1171 (10th Cir. 1999)).

The preservation requirement is an independent state ground which implicates procedural bar principles on federal habeas. See Cargle v. Mullin, 317 F.3d 1196, 1205-06 (10th Cir. 2003) (state court denial of relief for asserted federal error because of failure to satisfy state law predicate constitutes independent state ground); Lopez v. Williams, 59 Fed. Appx. 307, 311 (10th Cir. 2003). The Court must also determine whether the preservation rule was adequate, e.g., whether it was firmly established or regularly followed at the time of Torres' trial.

This Court has described the preservation rule as "an age-old Kansas rule that has been

routinely followed for decades." <u>Wimbley v. Werholtz</u>, No. 04-3320-MLB, 2005 WL 2293600, at

*5 (D. Kan. Sept. 20, 2005).  Torres does not establish that the Kansas contemporaneous objection

rule is not strictly or regularly followed or that it is not applied evenhandedly to claims similar to

those he raises.  <u>See</u> <u>Carr v. Koerner</u>, 120 Fed. Appx. 772, 775 (10th Cir. 2005) (contemporaneous

objection rule independent and adequate state ground).

 Torres has offered no cause for the procedural default of the evidentiary issues regarding

gruesome photographs or expert testimony on shaken baby syndrome.  Because the Kansas Supreme

Court held that Torres had procedurally defaulted these claims, he faces procedural default in this

forum unless he shows cause excusing the default and prejudice, or a fundamental miscarriage of

justice.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 749 (1991).  Although ineffective assistance of

counsel may establish cause for a procedural default, <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986),

petitioner does not assert ineffective assistance or any cause for his procedural default.[3]  Finally,

---

 [3] As cause, based on trial counsel's failure to preserve the issues of gruesome
photographs and expert testimony on shaken baby syndrome, Torres could have raised ineffective
assistance of trial counsel.  To demonstrate ineffectiveness of counsel, petitioner must generally
show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that
counsel's deficient performance was prejudicial. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 690
(1984); <u>United States v. Lopez</u>, 100 F.3d 113, 117 (10th Cir. 1996).  In order to meet the first
element, petitioner must show that counsel made "errors so serious that counsel was not functioning
as the 'counsel' guaranteed by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687. Petitioner must
show that counsel's conduct did not fall within the range of competence demanded of an attorney
in a criminal case.  <u>Id.</u> at 689; <u>United States v. Carr</u>, 80 F.3d 413, 417 (10th Cir. 1996).  Courts are
to review such claims with a strong initial presumption that counsel conduct falls within this
acceptable range, thereby eliminating the "distorting effects of hindsight." <u>Strickland</u>, 466 U.S. at
688-89; <u>Carr</u>, 80 F.3d at 417.  With regard to the second element, petitioner must show that
counsel's errors were so serious as to deprive him of a fair proceeding in which the result is reliable.
<u>Strickland</u>, 466 U.S. at 687.  The element is satisfied by evidence of a "reasonable probability that,
but for the alleged errors, the results of the proceedings would have been different." <u>Id.</u> at 695.

 On this record, Torres cannot show that introduction of this evidence was so prejudicial as
(continued...)

petitioner has not shown that a miscarriage of justice may result if the Court does not hear his claims. To make this showing, petitioner must demonstrate that constitutional error has probably resulted in the conviction of one who is actually innocent.  See Bousley v. United States, 523 U.S. 614, 623 (1998).  Although petitioner makes the naked assertion that he is actually innocent, he provides no factual basis for the assertion.  For these reasons, the Court finds that petitioner has procedurally defaulted his claims regarding the admission of gruesome photographs and expert testimony on shaken baby syndrome.  The Court therefore will not consider the merits of these two claims.

**II.     Merits Of Claims Properly Before the Court**

        A.     Sufficiency Of Evidence Regarding Felony Murder

Under Kansas law, felony murder requires a finding that the killing of a human being was committed "in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. [§] 21-3436 and amendments thereto."  K.S.A. § 21-3401.  The state charged Torres with committing the inherently dangerous felony of child abuse, specifically, intentional "shaking which results in great bodily harm or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years."  K.S.A. § 21-3609; see K.S.A. § 21-3436(a)(7).  Torres argues that the State presented insufficient evidence of felony murder.  Torres specifically argues that the state presented insufficient evidence of shaking which resulted in great bodily harm or intentional, cruel and inhuman bodily punishment.

On appeal, the Kansas Supreme Court applied a standard which is similar to federal law:

_____

[3](...continued)
to change the outcome of the trial.  Torres therefore cannot meet the second prong of the Strickland analysis.  Because Torres cannot show ineffective assistance of counsel, he also cannot show that counsel's actions rose to a level of error sufficient to remove the procedural bar.

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." Torres, 280 Kan. at 318, 121 P.3d at 437 (quoting State v. Burhans, 277 Kan. 858, 871 (2004)); cf. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (evidence sufficient to support criminal conviction if viewing evidence in light most favorable to prosecution, rational fact finder could have found essential elements of crime beyond reasonable doubt).

The Kansas Supreme Court held that the following evidence supported the jury's finding that petitioner inflicted intentional, cruel and inhuman bodily punishment and caused Tianna's injuries: (1) Torres did not dispute that he was the only person with Tianna when she became unconscious, (2) Tianna's mother and Kelly Robbins both testified that Torres admitted to them that he shook Tianna and threw her toward the bed where she hit her head on a night stand, (3) Dr. Liong and Dr. Zauche testified that the injury was an intentional one, shaken baby syndrome, and that her injuries were not consistent with falling off a chair, (4) Dr. Smith and Dr. Desilet-Dobbs gave opinions that Tianna's injury occurred shortly before she became unresponsive on June 25, (5) Dr. Dudley testified that Tianna's injuries indicated shaking and an impact, and (6) even Torres' own expert, Dr. Gilmartin, testified that although he did not discern evidence that Tianna had been shaken, he believed that severe child abuse had caused her death. The Kansas Supreme Court concluded that a rational fact finder could find beyond a reasonable doubt that Torres had committed felony murder based on the underlying felony of child abuse. Torres, 280 Kan. at 318, 121 P.3d at 437. The decision of the Kansas Supreme Court constitutes a reasonable application of federal law. Petitioner is not entitled to habeas relief on this ground.

15

B.     Sixth Amendment Right To Confrontation – Confession

Petitioner alleges that the trial court violated his Sixth Amendment right of confrontation because the state presented evidence of his out-of-court statements to law enforcement officers.  On appeal Torres argued that under Crawford v. Washington, 541 U.S. 36 (2004), he had a procedural right to confront any witness whose testimonial statements were used at trial.  In Crawford, the Supreme Court held that the Confrontation Clause bars out-of-court testimonial statements of unavailable witnesses unless defendant is afforded an opportunity to crossexamine.[4]  541 U.S. at 53-54 (under the Confrontation Clause, framers would not have allowed admission of testimonial statements of witness who did not appear at trial unless he was unavailable to testify, and defendant had had prior opportunity for cross-examination).  Torres claims that Crawford applies to his statement to law enforcement officers.  He then argues that use of his statements forced him to either

---

[4]     Before Crawford, the test for allowing an unavailable witness' prior out-of-court statements was set out in Ohio v. Roberts, 448 U.S. 56 (1980), which required adequate indicia of reliability based on either a "firmly rooted hearsay exception" or a finding that the statement bore "particularized guarantees of trustworthiness."  Roberts, 448 U.S. at 66.  In Crawford, the Supreme Court stated that "[t]he Roberts test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability."  Crawford, 541 U.S. at 62.  The Crawford decision created a bright line rule that only allows testimonial statements of a witness, not appearing at trial, if the witness is both unavailable to testify and the adverse party has had an opportunity for cross-examination.  Id. at 53-54.  The Crawford Court did not fully define the meaning of "testimonial," but offered some examples of "testimonial" evidence, including:

> ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Crawford, 541 U.S. at 51-52 (quotations and citations omitted).

16

forego his Fifth Amendment right against self-incrimination and testify himself about his out-of-court confession, or exercise his Fifth Amendment right and thus allow the unchecked testimonial statements, in violation of his Sixth Amendment right of confrontation as set out in <u>Crawford</u>.

The Kansas Supreme Court held that even though Torres did not testify, <u>Crawford</u> did not prohibit the admission of his out-of-court statements.[5]  In these circumstances, the Kansas Supreme Court found no authority for the proposition that the Sixth Amendment guarantees a right to "confront oneself" at trial.  The Court therefore concluded that Torres had not shown a violation of Sixth Amendment rights.

After <u>Crawford</u>, most courts addressing this issue have found that a party's own admission offered against him can be admitted without the right to cross-examination.  <u>See</u>, <u>e.g.</u>, <u>United States v. Brown</u>, 441 F.3d 1330, 1359 (11th Cir. 2006) (party's own admission offered against him not testimonial), <u>cert. denied</u>, 127 S.Ct. 1149 (2007); <u>cf.</u> <u>United States v. Briscoe-Bey</u>, 126 Fed. Appx. 551, 553 (3d Cir. 2005) (apparently assuming defendant's own statements not testimonial); <u>State v. Konohia</u>, 107 P.3d 1190, 1199 n.11 (Haw. Ct. App. 2005) (defendant has no right to confront himself); <u>State v. Adams</u>, 280 Kan. 494, 511, 124 P.3d at 32 (2005); <u>but see</u> <u>United States v. Gibson</u>, 409 F.3d 325, 338 (6th Cir. 2005) (out-of-court confessions by defendant arguably raise confrontation problems under <u>Crawford</u>).  Where the "witness" against defendant is the defendant himself, there is no violation of defendant's Sixth Amendment right to confront because the defendant only has the right to confront the witnesses against him.  <u>See</u> <u>United States v. Lafferty</u>, 387

---

[5]        The Kansas Supreme Court concluded that petitioner's right against self-incrimination did not conflict with his right to confront witnesses.  <u>Torres</u>, 280 Kan. at 320, 121 P.3d at 438.  It further stated that petitioner was not compelled to disclose information to law enforcement, but chose to do so.

F. Supp.2d 500, 511 (W.D. Pa. 2005) (citing U.S. Const. amend VI) (inherent in <u>Crawford</u> opinion's analysis is idea that right of confrontation applies to accusations of third parties implicating a criminal defendant, not a criminal defendant implicating himself). The Kansas Supreme Court ruling is not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, and did not involve an unreasonable determination of the facts in light of the evidence presented.

Further, even if the trial court erred in admitting petitioner's statements, Confrontation Clause errors are subject to harmless error analysis. <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986). Here, even without Torres' statements to law enforcement personnel, there is little likelihood that the result of the trial would have changed. The testimony of medical personnel, combined with Tianna's injuries, provided the jury sufficient evidence to convict. No habeas relief is warranted on this claim.

C.   <u>Failure To Record Interviews</u>

Torres alleges that the state violated his due process rights when it did not record his two interviews with law enforcement and that the district court erred because it did not instruct the jury that it could draw an adverse inference based on the state's failure to record the interviews. In arguing that the state violated his due process rights when they did not record his interviews, Torres relies upon <u>Arizona v. Youngblood</u>, 488 U.S. 51, 57 (1988). In <u>Youngblood</u>, the Supreme Court stated in dicta that the defendant could set forth a due process violation by showing that police acted in bad faith in failing to preserve evidence "that could have been subjected to tests, the results of which might have exonerated the defendant." On appeal, the Kansas Supreme Court correctly stated that <u>Youngblood</u> held that absent bad faith, failure to preserve potentially useful evidence does not

18

violate due process.  The Kansas Supreme Court found that petitioner had not shown bad faith on the part of law enforcement, and also noted that neither Kansas nor federal law requires police to record interviews.  Because law enforcement officials had no duty to record the interviews, the Kansas Supreme Court further found that the trial court's failure to instruct the jury that it could draw an inference from the state's failure to record the interview was not clearly erroneous.  This determination by the Kansas Supreme Court was reasonable and was neither contrary to, nor an unreasonable application of, United States Supreme Court precedent.  This claim is without merit and does not warrant federal habeas relief.

        D.      <u>Denial Of Motion To Suppress</u>

Torres alleges that the trial court violated his Fifth Amendment rights when it denied his motion to suppress his statements to law enforcement officials.  Torres alleges that the questioning on June 27 and July 6, 2001 constituted custodial interrogation.  He asserts that the trial court should have suppressed his statements because officers did not advise him of his Fifth Amendment rights against self-incrimination.

It is well established that police officers are not required to administer <u>Miranda</u> warnings to everyone they question.  <u>United States v. Erving L.</u>, 147 F.3d 1240, 1246 (10th Cir. 1998).  <u>Miranda</u> applies only to "custodial interrogation."  <u>Miranda</u>, 384 U.S. at 439.  A person is not "in custody" for <u>Miranda</u> purposes unless his freedom of action is curtailed "to a degree associated with formal arrest."  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984).  The "in custody" determination is based on how a reasonable person would understand the situation.  <u>Id.</u> at 442.  This reasonable person "does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer."  <u>Erving L.</u>, 147 F.3d at 1247.  Police officers are not

required to administer <u>Miranda</u> warnings simply because the questioned person is a suspect. <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983).

The Kansas Supreme Court applied the correct standard in reviewing the trial court's determination that Torres was not in custody when he gave the statements on June 27 and July 6, 2001. The Kansas Supreme Court quoted the trial court findings, as follows:

> Well, after having heard the evidence, the Court finds that the defendant voluntarily presented himself on both occasions to the Wichita County Sheriff's Office; that his effort there was as much to share information as to give information and to - and each party apparently gave information to the other. That on both occasions the defendant was free to leave, if he chose to. That, in fact, on the second interview both Sheriff Collins and Special Agent Robbins got up and left the room, left the door open, the defendant remained there of his own free will. The Court doesn't see any - the Court admits that the defendant may have been under some emotional distress because - on the first occasion because of the condition of his daughter and on the second occasion because of her relatively recent funeral. But even though the defendant may have been under emotional distress, his statements were still freely and voluntarily given, that this was clearly an investigatory interrogation or interview as opposed to a custodial interrogation and interview; that Miranda warning was not necessary considering the circumstances of these two interviews. So the defendant's motion to suppress is denied.

<u>Torres</u>, 280 Kan. at 323, 121 P.3d at 440. The Kansas Supreme Court reviewed the evidence at the suppression hearing, and found that the trial court findings were supported by substantial competent evidence; specifically, the testimony of Robbins and Collins and to some degree Torres. The Supreme Court then conducted a de novo review of the legal conclusion that Torres was not in custody during the two interviews. It concluded that a reasonable person would not have believed that he was in custody during the interviews on June 27 and July 6. The Supreme Court reasoned as follows:

> Torres drove himself to both interviews and appeared without law enforcement invitation for the first one. Either his mother or both parents were at the sheriff's department at the time of the interviews. He was not physically restrained at any time. He left the sheriff's department after both interviews were completed. His

> mother was told he could return to work.  Although Collins testified that Torres was
> considered a suspect at the time of the July 6 interview, law enforcement's suspicions
> are irrelevant if those suspicions are not disclosed to the defendant.  See State v.
> Heath, 264 Kan. 557, 590, 957 P.2d 449 (1998).

Torres, 280 Kan. at 325, 121 P.3d at 441.  The Kansas Supreme Court determination was reasonable and was neither contrary to, nor an unreasonable application of, United States Supreme Court precedent.  This claim does not warrant federal habeas relief.

E.    Jury Instruction Regarding Lesser Included Offenses

Petitioner alleges that the trial court erred in not giving a lesser included offense instruction for reckless second degree murder and reckless involuntary manslaughter.  Petitioner argues that the trial court should have instructed the jury on reckless second degree murder and reckless involuntary because there was no evidence of shaken baby syndrome or shaken impact syndrome and the state's theory supported giving the lesser included offense instructions.  Because petitioner did not request such instructions, the Kansas Supreme Court reviewed the issue for clear error.  The Kansas Supreme Court noted that under Kansas law in felony murder cases, the court need not instruct the jury on lesser included offenses unless evidence of the underlying felony is "weak, inconclusive, or conflicting."  Torres, 280 Kan. at 326, 121 P.3d at 442 (citing State v. Branning, 271 Kan. 877, 26 P.3d 673 (2001)).   The Kansas Supreme Court found that because Torres admitted to law enforcement and to Tianna's mother that he had shaken and thrown Tianna, failure to give the lesser included offense instruction was not clearly erroneous.

In his habeas petition, Torres does not claim that failure to give the lesser included instruction violated his federal constitutional rights.  Even if he made such a claim, the Supreme Court has not recognized a federal constitutional right to a lesser included offense instruction in non-capital cases. See Beck v. Alabama, 477 U. S. 625, 638 n.14 (1980).  Torres therefore cannot raise a debatable

claim that he is entitled to habeas relief on this ground.

     F.     <u>Admission Of Photographs</u>

Torres next asserts that the admission of cumulative and gruesome photographs of Tianna before, during and after the autopsy violated his right to a fair trial. At trial, Torres only objected to Exhibits 22 and 31. He argues, however, that the state presented a plethora of other photographs which were cumulative and highly prejudicial. As already noted, except as to Exhibits 22 and 31, this claim is procedurally barred.

Exhibit 22 is a photograph of Tianna's body, clothed in a diaper laying on a white sheet before the autopsy. The photograph shows a brain pressure monitor attached to her head, an endotracheal tube, a gastric tube, needle puncture marks and catheters. Exhibit 31, taken during the autopsy, shows Tianna's scalp reflected forward and backward. No facial features or other body parts are visible. Dr. Dudley testified that this photograph showed a large area of hemorrhage under the scalp and on the bone.

The Kansas Supreme Court found that the two photographs were relevant and admissible to prove the manner of death, to explain medical testimony, or both. <u>Torres</u>, 280 Kan. at 327, 121 P.3d at 442. Because the admission of photographs is generally a matter of state evidentiary rules, federal courts on habeas review look only to "whether the admission of the photographs rendered the proceedings fundamentally unfair." <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1275 (10th Cir. 1999). In light of the probative value of the photographs and the other evidence which incriminated Torres, the Court cannot conclude that the Kansas Supreme Court acted contrary to or unreasonably applied

federal law in concluding that admission of the photographs was proper.[6]  Torres is not entitled to habeas relief on this claim.

>  G.   Prosecutorial Misconduct

Torres alleges that the trial court erred by not properly investigating an accusation that the prosecutor tampered with a witness.  Torres alleges that the prosecutor threatened Tianna's mother, Susan Rodriguez, that the state would take her newborn baby and send her sister to jail if she did not testify differently at trial than she had testified at the preliminary hearing.  The Kansas Supreme Court summarized the factual background of this claim as follows:

> Torres' attorney, Lucille Douglass, spoke with the district court about possible threats made to Susan by the prosecutor, Wade Dixon.  During the trial, Torres' attorney came into contact with Susan Rodriguez at Teresa Torres' house.  The attorney asked Susan how she was doing. Susan said in a very angry outburst, "I'm tired of courts, I'm tired of being here, I'm tired of not being able to talk to Abel.  And you got me subpoenaed so I have to do it again."  Susan said, "[The prosecutor] told me it was up to me to send Abel, that if I didn't say what they wanted they would take my baby away and send my sister to prison. . . . [T]hat's why I testified differently this time [at the trial as opposed to the preliminary hearing]."

> Torres requested a mistrial based on this information.  The district court raised the possibility of bringing Susan to court, putting her under oath, and hearing what she said.  Torres' attorney did not believe Susan would say anything with the prosecutor there, out of fear that her son would be taken away and her sister sent to prison if she did not testify the way the State wanted her to testify.

> The prosecutor told the court that he believed the perceived threats were from a conversation he had with Susan where he told her that it would be difficult to convince the jury that what the State alleged against Abel was true unless Susan believed that it was true, and he needed to know whether Susan believed it was true.

> The court took a recess to consider the issue, and then stated:
> "I had a chance to think about the allegations that Ms. Rodriguez has told Ms.

---

[6]      The Court has reviewed all of the photographs admitted at trial.  Though some of the photographs are disturbing – as one would expect of autopsy photographs of a young child – the photographs are not particularly gruesome.

> Douglass about, and it appears to me that if Ms. Douglass has Ms. Rodriguez under
> subpoena, she can ask her any question she wants as long as it is relevant to the case.
> And the conversation that Ms. Rodriguez had with Miss Douglass would certainly be
> relevant with regard to the facts of the case.  I don't think it's a mistrial situation as
> much as it is the credibility of a witness, so the motion for a mistrial is denied.

Torres, 280 Kan. at 328, 121 P.3d at 443.

At trial, the defense called Rodriguez to testify.  She testified that she understood that Torres

had violently shaken Tianna.  She stated that her trial testimony was not different from her previous

testimony, although her answers at trial were "more direct."  She also testified that she was not afraid

that anything would happen to her because of her testimony.

After the jury returned a guilty verdict, Torres sought a new trial because the district court

had not conducted a hearing on whether the prosecutor made improper statements to Rodriguez and

whether such statements had anything to do with her trial testimony.  The court denied the motion,

stating:

> The trial lasted about a week.  And the defense team had subpoenaed the witness in
> question, Susan Rodriguez, to testify on their behalf after she had testified on behalf
> of the State.  I can't remember exactly when it was in the trial, but I think it was after
> the State rested, that Ms. Douglass, one of the defense team attorneys, came to us and
> asked that we have an in camera session with regard to some statements that had been
> made to her and, as I recall, in the presence of other people the night before the
> defense was to put on their case.
>
> And my recollection is that Ms. Douglass said that Ms. Rodriguez came to where she
> was and that she was hysterical.  That she made statements that . . . indicated to Ms.
> Douglass that she had been threatened by Mr. Dixon [the prosecutor] that her children
> would be removed from her if she . . . did not testify the way that Mr. Dixon had told
> her to testify.
>
> [A]t any time during the trial, especially during a week-long trial, the parties have an
> opportunity to interview any witnesses they choose to interview, if those witnesses
> will allow themselves to be interviewed.  And that is essentially what happened in
> this case.
>
> The Court decided at that time that an in camera examination, and I don't recall if I

24

was asked or not, but if I had been asked I would have decided that an in camera examination of a current witness would have been inappropriate since the defense team had an opportunity to visit with that witness on the stand in open court.  And that's exactly what happened.

As I recall, the subject of that evening conversation was brought up when Mrs. Rodriguez was on the stand.  It wasn't pursued particularly hard because Mrs. Rodriguez at the time denied that any threats had been made to her, or that she had had that conversation with Ms. Douglass.

I suppose . . . in retrospect that Ms. Douglass could have called whatever witnesses were present at the time those statements had been made, and she chose not to do so.  The subject wasn't pursued particularly hard.  Certainly had Ms. Douglass asked for Ms. Rodriguez to be deemed a hostile witness, the Court probably would have done so.

I can assure you that had Ms. Rodriguez testified the same way that Ms. Douglass thought she was going to testify, the Court would have taken serious steps to investigate the matter with regard to prosecutorial misconduct.  But other than Ms. Douglass's statements, there was nothing from the stand under oath that would lead the Court to believe that any misconduct had taken place.  Or that the testimony of Ms. Rodriguez was perjured in any way.

Torres, 280 Kan. at 330-31, 121 P.3d at 444.  The Kansas Supreme Court noted that Torres did not cite any legal authority that the district court had a duty to do anything beyond what it did.  The Kansas Supreme Court found that the trial court did not abuse its discretion in denying the motion for mistrial and in failing to conduct an in camera meeting or evidentiary hearing on the allegations of prosecutorial misconduct.

The Kansas Supreme Court noted that although the trial court overruled the motion for mistrial, it allowed Torres' counsel to question Rodriguez about the incident.  Rodriguez testified that she did not testify differently than she had previously and stated that she was not afraid that anything would happen to her because of her testimony.  The Kansas Supreme Court found that Torres failed to show that the trial court abused its discretion in denying the motion for a mistrial and failing to conduct an in camera meeting or evidentiary hearing on the allegations of prosecutorial misconduct.

Id.

In considering a claim of prosecutorial misconduct on federal habeas review, the question is whether the prosecutor's conduct was so egregious as to render the entire proceedings fundamentally unfair. Short v. Sirmons, 472 F.3d 1177, 1195 (10th Cir. 2006) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 642-48 (1974)); see also Smith v. Phillips, 455 U.S. 209, 219 (1982) (touchstone of due process analysis in alleged prosecutorial misconduct is fairness of trial, not culpability of prosecutor). Federal habeas relief addresses only egregious misconduct that would amount to a constitutional denial of due process. Smith, 455 U.S. at 221. The Kansas Supreme Court's ruling on this issue was not contrary to and did not involve an unreasonable application of United States Supreme Court precedent. Torres is not entitled to habeas relief on this ground.

H.     Illustrations As Demonstrative Evidence

Petitioner asserts that the trial court violated his Sixth Amendment right to a fair trial when it allowed the state to present six demonstrative illustrations of shaken baby impact and shaken baby syndrome. The trial court allowed prosecution witnesses to use the illustrations to help explain testimony, but not as evidence. The exhibits included diagrams and renditions of what occurs with the mechanism of shaken baby syndrome, the blood supply over the surface of the brain, the layers of the brain, the locations where fluid would collect between the layers of the brain with these injuries, and the inside of the eye with retinal hemorrhages. Dr. Dudley used the exhibits in conjunction with photographs of Tianna's brain to show where the injury occurred. The state argued that all of the information on the diagrams came in through Dr. Dudley's testimony, and that the illustrations did not expose the jury to anything beyond the admitted evidence.

On appeal, the Kansas Supreme Court found the exhibits were a fair and accurate

representation of the human body and that they were useful to explain Dr. Dudley's medical testimony regarding shaken baby syndrome and shaken impact syndrome. Torres, 280 Kan. at 332, 121 P.3d at 445. The Kansas Supreme Court concluded that the trial court did not err in allowing use of the demonstrative evidence.

On habeas review, this Court looks only to whether the exhibits rendered the proceeding fundamentally unfair. See Vigil v. Tansy, 917 F.2d 1277, 1280 (10th Cir. 1990); see also Bullock v. Carver, 297 F.3d 1036, 1055 (10th Cir. 2002). Applying this standard, Torres is not entitled to federal habeas relief on this ground.

I.      Expert Witness Testimony

Torres asserts that the trial court erred in allowing the state to call six expert witnesses while he presented only one expert. At trial, Torres only objected to Dr. Melhorn's testimony. The Kansas Supreme Court therefore found that he failed to preserve for appeal his argument that the trial court should not have allowed six experts to testify for the state. As to Dr. Melhorn's testimony, the Kansas Supreme Court found that her testimony corroborated the other medical testimony regarding Tianna's injuries and that the admission of the testimony, while cumulative in part, was not an abuse of discretion. Id.

In federal habeas proceedings, the Court will not question a state court's evidentiary ruling unless petitioner can show that as a whole, it rendered his trial fundamentally unfair. Saathoff v. Hesse, 72 F.3d 138, 139 (10th Cir. 1995). In Fox v. Ward, 200 F.3d 1286, 1297 (10th Cir. 2000), the Tenth Circuit determined that the testimony of various forensic experts was admissible because each expert was qualified to testify and was subject to rigorous cross-examination. Torres has not shown that his trial was rendered fundamentally unfair by the use of the medical personnel. All

27

medical personnel used by the state were qualified to testify and were subject to cross-examination. The state court rejection of Torres' argument on this matter was neither contrary to, nor an unreasonable application of, United States Supreme Court precedent. He is not entitled to habeas relief on this claim.

J.     <u>Dr. Dudley's Rebuttal Testimony</u>

Torres alleges that the trial court erred in allowing Dr. Dudley to testify in rebuttal to defense expert Dr. Gilmartin that Tianna's death was a homicide and that her death was a "case example" for shaken baby syndrome or shaken impact syndrome. Torres alleges that Dr. Dudley's testimony took from the jury its role of weighing the evidence and violated his constitutional right to a fair trial.

Concerning the death certificate, Dr. Dudley testified that "the cause of death is listed as shaken impact syndrome, and the manner of death is homicide." The Kansas Supreme Court stated that expert testimony that a child died as a result of child abuse or shaken impact syndrome did not invade the province of the jury, when the expert did not testify as to the ultimate question of the defendant's guilt or innocence. <u>Torres</u>, 280 Kan. at 334 , 121 P.3d at 446-47 (citing <u>State v. Struzik</u>, 269 Kan. 95, 101 (2000)).

The Kansas Supreme Court quoted Dr. Dudley's testimony as follows:

Well, basically this is my diagnosis, you know, my training and experience in this field of forensic pathology, with a specialty in child abuse cases and a special interest in shaken baby syndrome, really makes this a textbook case. This has every feature of a shaken impact syndrome including the impact site of the head injury with the fracture. It has the bruises that the child had, the linear skull fracture showing the impact, the separation of the sutures in the brain showing that there was swelling so severe that the brain caused the sutures to separate again, the extreme brain swelling with herniation, the bilateral retinal and optic nerve sheath hemorrhages, the posterior rib fractures, the severe injury to the brain.

Everything if I had to pick out a case example for shaken baby or shaken impact syndrome, it would be this case. And my diagnosis is shaken impact syndrome,

which I made at the time I did the autopsy, and it stands to be that today.

280 Kan. at 335, 121 P.3d at 447.  The Kansas Supreme Court noted that the entire passage shows that Dr. Dudley based her conclusion on specific medical findings, and that her opinion that the death was a "textbook case" or "case example" for shaken baby syndrome or shaken impact syndrome merely reinforced her testimony rebutting Dr. Gilmartin's defense testimony that there was no evidence that Tianna had been shaken.  The Kansas Supreme Court found that Dr. Dudley's testimony did not go to the ultimate question of Torres' guilt or innocence.

In the alternative the Kansas Supreme Court found even if Dr. Dudley's testimony was inadmissible, the error did not deny Torres the constitutional right to a fair trial; given the large amount of evidence supporting the state's case, Dr. Dudley's testimony had little or no likelihood of changing the result of the trial.  This determination by the Kansas Supreme Court was reasonable and was neither contrary to, nor an unreasonable application of, United States Supreme Court precedent.  Torres is not entitled to habeas relief on this claim.

K.     Cumulative Error

Finally, Torres asserts that the cumulative effect of trial errors denied him due process under the Fifth, Sixth and Fourteenth Amendments of the Constitution.  The Court may find cumulative error when two or more harmless errors result in potential prejudice to a defendant to the same extent as a single reversible error.  Miller v. Mullin, 354 F.3d 1288, 1301 (10th Cir. 2004) (quoting Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003)).  The Court aggregates individual harmless errors and determines whether the cumulative effect is no longer harmless.  Id.  The Kansas Supreme Court found no error, and this Court has found none.  This Court cannot find that the Kansas Supreme Court evaluation of cumulative error was contrary to, or an unreasonable

29

application of, clearly established federal law.

For the reasons discussed above, the Court concludes that Torres' habeas petition does not establish any instance where the state proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § (d)(2).

**IT IS THEREFORE ORDERED** that the <u>Petition Under 28 U.S.C. § 2254 For Writ Of Habeas Corpus By A Person In State Custody</u> (Doc. #1) filed August 25, 2006 be and hereby is **DENIED.**

**IT IS FURTHER ORDERED** that petitioner's request for an evidentiary hearing be and hereby is **DENIED**.[7]

Dated this 4th day of June, 2007 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
Kathryn H. Vratil
United States District Judge

---

[7]      To be entitled to an evidentiary hearing in a federal habeas action, petitioner must first make allegations which, if proved, would entitle him to relief. <u>Medina v. Barnes</u>, 71 F.3d 363, 366 (10th Cir. 1995). The Court must then determine whether petitioner is entitled to an evidentiary hearing to resolve any disputed facts underlying his claims. Here, the factual record is fully developed. After carefully reviewing Torres' allegations, the Court finds that his conviction was not "contrary to" or an "unreasonable application" of existing federal law or the Constitution, and it finds no need to further develop the record.